

12424 Wilshire Boulevard
12th Floor
Los Angeles California 90025
Telephone 310.826.7474
Facsimile 310.826.6991

April 26, 2013

**Via ECF**

The Honorable Jon Tigar
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom 9, 19th Floor
450 Golden Gate
San Francisco, CA 94102

**Re: *EPL Holdings, LLC v. Apple Inc.*, CV 11-
Joint Letter Re: Protective Order**

Dear Judge Tigar:

By this letter, Plaintiff-Counterclaim Defendant EPL Holdings, LLC ("Plaintiff" or "EPL") and Defendant-Counterclaimant Apple Inc. ("Defendant" or "Apple") (collectively, "the Parties") having met and conferred request that the Court enter a protective order and resolve the disputed provisions as shown in the Proposed Protective Order attached hereto as Exhibit A. The Parties simultaneously exchanged their below positions.

## I. Plaintiff EPL's Positions[1]

The parties have agreed on the majority of the form of the protective order in this case. Despite the numerous concessions made by EPL during the negotiation process,[2] Apple has not been satisfied and demands more. The restrictions still sought by Apple are not designed to protect the confidentiality of its information but instead are designed to prejudice EPL in all facets of this case. For example, under Apple's proposals for the disputed provisions: EPL's source code reviewers would not be allowed to confer with counsel during the review (Ex. A, ¶ 9(c)); EPL could not use source code in this case without prior authorization from Apple, which could be arbitrarily withheld (Ex. A, ¶ 9(k)); and EPL must return to Apple all copies of pleadings, correspondence, and consultant work product—including attorney-client privileged communications and documents—containing source code in violation of counsel's ethical duty of confidentiality and duty to preserve evidence (Ex. A, ¶ 15). These draconian restrictions seriously prejudice EPL's ability to efficiently litigate this case but provide little if any increase in security.

### A. Legal Standards

A party opposing disclosure carries the burden of showing "'good cause' why a protective order is necessary." *E.g.*, *Phillips v. General Motors Corp.*, 289 F.3d 1117, 1121 (9th Cir. 2002) (citing Fed. R. Civ. P. 26(c)). "For good cause to exist, the party Seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips*, 289 F.3d at 1121 (emphasis added). "[B]road allegations of harm, unsubstantiated by specific

---

[1] EPL respects the Court's time and the page limits imposed. In order to comply with the Court's 8-page limit, EPL has worked diligently to keep its arguments to less than the 4-pages allotted to each side. Nevertheless, EPL was forced to leave out many meritorious arguments in support of its positions.

[2] For example, Apple's source code can only be reviewed on a single computer located at the offices of Apple's outside counsel (Ex. A, ¶¶ 9(a) and 9(c)); only limited excerpts of source code may be printed and only as necessary (Ex. A, ¶ 9(e)); printed copies must be kept in a secure, locked location and EPL must log of who has viewed the source code (Ex. A, ¶ 9(j)); only persons expressly approved may view source code (Ex. A, ¶¶ 9(a)–(c)); and protected material can only be used for purposes of litigation (Ex. A, ¶ 1).






examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* (quoting *Beckman Indus., Inc. v. International Inc. co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotations omitted). If a court finds that a particularized harm has been shown, it must be balanced against the prejudice to other parties. *See id.* Regional circuit law govern non-patent issues related to protective orders. *See In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1377 (Fed. Cir. 2010).

B. <u>Paragraphs 2.9 and 7.2(c): Access to "CONFIDENTIAL" Information or Items</u>

EPL proposes that up to three (3) officers, employees, or <u>licensing agents</u> of a party may be designated to view CONFIDENTIAL materials (the lowest of the three levels of designation). Unlike Apple, EPL is a small company with only a handful of employees and has no in-house counsel or patent litigation specialists. Thus, EPL requests the option of designating its licensing agent to represent its interests here. Like any other person that receives confidential information, licensing agents will obligated to comply with the provisions of the protective order. Apple cannot articulate how it would suffer any more risk than EPL suffers when Apple discloses EPL's confidential information to its officers or employees.

C. <u>Paragraph 8: Patent Prosecution Bar</u>

The Federal Circuit has recognized that the typical provisions found in protective orders limiting the use of confidential material only for the purposes of the current litigation are "generally accepted as an effective way of protecting sensitive information while granting trial counsel limited access to it for purposes of the litigation."[3] *Deutsche Bank*, 605 F.3d at 1378. A party seeking to include a prosecution bar in a protective order carries the burden of showing good cause. *See id.* at 1378. First, the party must show that there is risk of inadvertent disclosure or competitive use of confidential information, which requires a showing that the counsel to be barred is involved in <u>competitive decisions making</u> for its client. *See id.* at 1379–80. Second, the court must balance the risk against potential harm to the opposing party from the restrictions imposed. *See id.* at 1379. "[A] party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* at 1381.

Here, EPL's proposed prosecution bar gives Apple virtually everything it seeks. The dispute, however, is whether litigation counsel can participate in PTO proceedings initiated by Apple or a third party (e.g., *inter partes* review). Litigation counsel should be able to participate in such proceedings. Such third-party initiated proceedings are fundamentally different than patent prosecution (i.e., obtaining a patent) and are more akin litigation. There is no particularized harm that Apple can show that would justify barring EPL's litigation counsel from participating in such proceeding that are typically initiated only for tactical reasons by defendants already in district court litigation.

First, there is little risk of inadvertent or competitive use of confidential information if EPL's litigation counsel were allowed to participate in third-party initiated proceedings as required under *Deutsche Bank* because EPL has already agreed to be barred from substantive patent prosecution. That is because, to date, EPL's litigation counsel has neither been involved in patent prosecution for EPL, nor in competitive decisions making. To the extend Apple argues that claims scope can be affect during certain third party-initiated proceeding, the risk of inadvertent disclosure or competitive use is insufficient under *Deutsche Bank*. *See id.* at 1378-80 (Substantive involvement in prosecution involves "obtaining disclosure materials for new inventions" or "writing, reviewing, or approving new applications or continuations-in-part of application"; competitive decision making requires "counsel's advice and participation in any or of the client's decisions (pricing, product design, etc.)"). In third-party initiated proceedings the patent holder cannot simply remove and add claims at will as in a typical prosecution. Indeed, in an *inter partes* review proceeding, claims can only be narrowed and only if the Patent Trial and Appeals Board

---

[3] A patent prosecution bar is governed by Federal Circuit law. See Deutsche Bank, 605 F.3d at 1378.






panel approves a motion showing why such substituted claims are appropriate and overcome the prior art at issue. Similarly, in a reexamination, the patent holder cannot broaden the scope of their claims.

Second, the harm to EPL far exceeds any possible risk of inadvertent disclosure. EPL's proposal only seeks to carve out the ability for EPL to have its litigation counsel participate in third-party initiated PTO proceeding, which are akin to litigation. Third-party initiated proceeding are far more limited that patent prosecution, e.g., in *inter partes* reviews claims cannot be freely amended. *See* 35 U.S.C. § 315(d)(3) (amendments cannot "enlarge the scope of the claims of the patent or introduce new matter"). Patentees for years have been allowed to use the same counsel for years in multiple district court actions, where confidential information from multiple defendants is considered when making validity and claim construction arguments. A third-party initiated PTO proceeding is not substantively different than litigation.

The harm to EPL would be substantial. If Apple or a third party initiated proceedings in the PTO to invalidate a patent-in-suit here, EPL would be forced to litigation in a forum not of its choosing while being deprived of its chosen counsel. EPL would be forced to defend the same patents on two different fronts and bear the expense of retaining two sets of counsels who would not even be able to coordinate with each other with respect to issues that have nothing to do with Apple's confidential information (e.g., prior art). Fairness requires that EPL's litigation counsel be able to fully participate in both in litigation and third-party initiated PTO proceeds just as Apple's litigation counsel would be allowed to participate. *See, e.g., Xerox Corp. v. Google, Inc.*, 270 F.R.D. 182, 185 (D. Del. Sept. 8, 2010) ("Plaintiff also has a legitimate interest in formulating a coherent and consistent litigation strategy.) Moreover, Apple's proposal is unfair because under it Apple's litigation counsel could freely participate in reexamination proceedings it initiated even though they would have access to EPL's confidential source code.

Apple also appears to be arguing that EPL's litigation counsel could not communicate with its client regarding matters related to litigation (e.g., infringement, claim construction, validity, and enforceability). EPL proposes a simple clarification that nothing in the prosecution bar shall prevent attorney-client communications related to litigation so long as the communications do not reveal confidential information. There is no reasonable justification for Apple' to oppose this provision unless it intends for ¶ 8 to interfere with normal attorney-client communications.

D. Paragraph 8: Patent Acquisition Bar

Apple's proposed acquisition bar is overly broad and unnecessary in light of the prohibition against using confidential information outside the scope of this limitation. (*See* Ex. A, ¶ 1.) Apple has not identified any specific risk of inadvertent disclosure or use of confidential information by litigation counsel in acquisition activity that Apple speculates might occur sometime in the future. The Federal Circuit, however, has advised against the type of speculation. *See Deutsche Bank*, 605 F.3d at 1378 ("'Whether an acceptable opportunity for inadvertent disclosure exists . . . must be determined . . . by the facts on a counsel-by-counsel basis . . . .' [That] determination should turn on the extent to which counsel is involved in 'competitive decisionmaking' with its client" (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984))).

E. Paragraph 9(c): Use of Computers During Source Code Review

EPL proposes that its reviewers simply be allowed to bring a personal laptop to take notes electronically and a cellphone to confer with counsel into the review room. Apple has no basis for objecting to these items, which are ubiquitous in Apple's corporate offices and its counsel's offices where source code is kept. Given the agreed to security provisions, including the express prohibition of copying native source code and that all ports on the review computer will be disabled, the only way that source code could be copied is by intentionally choosing to violate the protective order in full view of Apple (who is allowed to visually monitor the review room) by photographing the code one screen at a time. Apple's concern is simply not realistic and is instead designed to prejudice EPL.






Apple proposes that it would provide its own laptop for EPL to use to take confidential notes. However, that would put EPL's confidential work product in Apple's possession and control without adequate assurances that Apple could not access EPL's work product. For example, unencrypted versions of the notes could be cached and retrieved; or keystrokes could be captured and used to decrypt encrypted versions of the notes. Apple's proposed encryption is merely an illusory offer of security. Finally, Apple's proposal fails to provide anyway for EPL's code reviewers to communicate with counsel during the review.

F. Paragraph 9(e): Source Code Printing

The Parties already agree that only limited portions of source code may be printed and then only "when necessary to prepare court filings, pleadings, or other papers." (Ex. A, ¶ 9(e) (emphasis added).) Apple proposes to further limit printing of source code by putting an arbitrary, 5-page limit on the number of consecutive pages of source code that can be printed. Given that each page of printed source code contains mostly white space, we know from experience that Apple's proposed 5-page limit will be insufficient, e.g., to provide witnesses with enough context to permit questioning during depositions. This will allow Apple to evade discovery. Even though the model order contains no express limit (*see* Model Order, ¶ 9(d)), EPL has proposed a more reasonable, 50-page limit, which will minimize disputes and motion practice here. To the extent Apple argues that EPL's proposed 50-page limit will incrementally increase the risk of disclosure, the protective order already has numerous restriction related to printed source code.[4]

Given the exceedingly small 5-page limit proposed by Apple, EPL has proposed that the producing party shall seek resolution and have the burden of demonstrating that request is improper. EPL's position is consistent with Rule 26(c) of the Federal Rules of Civil Procedure. *See, e.g.*, *Phillips*, 289 F.3d at 1121 ("[T]he party Seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.").

G. Paragraph 9(k): Electronic Images/Copies of Source Code

EPL proposes that it be permitted to make electronic or other copies of source code when needed for Court filings, pleading, or other paper (e.g., expert reports). The inclusion of source code in papers may be necessary, e.g., when disputes arise related to functionality of the accused products and would aid the Court in resolving such disputes. Apple's proposal would require EPL to disclose its confidential work product and seek written permission from Apple before it could use source code in this litigation. And, nothing would prevent Apple for unreasonably withholding its consent and causing needless delays.

H. Paragraph 15: Final Disposition (Source Code)

For the final disposition of documents, EPL proposes the Court adopted the same language as contained in the model protective order, which recognizes the need for attorneys required to keep an archival copy of documents to comply with ethical duties to preserve evidence. For example, EPL may be required to preserve evidence if other cases involving the same patents are still pending. It is also not unheard of that a terminated matter must be re-opened. Finally, Apple's proposal would expressly require counsel for EPL to violate the duty of confidentiality by requiring counsel to return privileged communications and consultant work product to Apple.

---

[4] These restrictions include, inter alia: the paper copies must kept in a "secured, locked area (Ex. A, ¶ 9(j)); paper copies cannot be brought to depositions (except for a personal, work product copy), nor marked as exhibits (Ex. A., ¶ 9(i)); the receiving party can make no more than three (3) additional paper copies (Ex. A., ¶ 9(h)); and the receiving party must maintain a log who has inspected paper copies of source code (Ex. A, ¶ 9(j)).






**I. DEFENDANT APPLE'S POSITIONS**[5]

A. Paragraphs 2.9/7.2(c): Access to "CONFIDENTIAL" Information or Items

Protective orders are designed to protect the parties' confidential, proprietary, trade secret, and commercially sensitive information by limiting who can access this information and the purpose for which this information can be used. As this Protective Order sets forth, a party receiving protected materials may use the materials "solely for this case." This limitation recognizes that the use of such information by others outside of the context of this litigation could cause substantial economic damage, competitive disadvantage, and other harm.

Contrary to the purpose of this Protective Order, EPL seeks to allow patent-holding company IP Nav—whose only visible business is enforcing patents through litigation—to access Apple's information designated as "Confidential." Although not a party to this suit, IP Nav controls EPL's outside counsel and directs this litigation, as it has done against Apple in many cases over the past few years. As IP Nav admits on its website, its sole business is to turn patents into "revenue streams." Once permitted to see Apple's "Confidential" information, IP Nav could use those sensitive materials to conjure up other patent suits against Apple, which is the precise behavior that the Protective Order is designed to prevent. There is also no way to monitor IP Nav's use of Apple "Confidential" information. Moreover, because IP Nav is not a party to the litigation, Apple's ability to enforce the Protective Order against IP Nav is virtually non-existent. Thus, EPL's assertion that IP Nav needs to see Apple's "Confidential" information far outweighs the obvious harm to Apple resulting from the disclosure of this information to IP Nav.

B. Paragraph 8: Patent Prosecution Bar

The parties agree that a prosecution bar is appropriate for this matter because individuals granted access to confidential information, especially technical information, should not be permitted to use that information to prosecute patents. *See generally In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1381 (Fed. Cir. 2010). The parties disagree, however, as to (1) whether the bar should extend to *inter partes* review, post-grant review, and reexamination proceedings before the Patent and Trademark Office (PTO), and (2) whether the bar should extend to the acquisition of patents.

The Federal Circuit in *In re Deutsche* recognized that an attorney in possession of an opponent's confidential information should be barred from certain activities before the PTO due to the high risk of even inadvertent misuse of that information. *Id.* at 1380-81. For example, if an attorney has access to detailed confidential specifications of an adversary's products (or future products), such information could not help but influence any action that attorney undertakes to amend claims or preserve claim validity while also endeavoring to ensnare the adversary's products, as well as make representations that result in changes to claim scope.

The focus of the Federal Circuit's analysis in *In re Deutsche* was on whether litigation counsel's involvement in patent prosecution activities, including the very activities implicated in reexamination or review proceedings, would rise to the level of "competitive decisionmaking." *Id.* at 1380. The court reasoned that the risk of inadvertent disclosure of competitive information learned during litigation is much greater for those attorneys who have "the opportunity to control the content of patent applications and the direction and scope of protection sought in those applications." *Id.* As examples of specific involvement that rises to the level of competitive decisionmaking, the court pointed to an attorney's ability to amend and/or draft claims, as well as "investigating prior art," "making strategic decisions on the type and scope of patent protection that might be available or worth pursuing," or "strategically amending or surrendering

---

[5] Apple respectfully requests that the Court grant it a small extension of the page limit for submitting this dispute. Apple has worked diligently to reduce the number of disputes with respect to the Proposed Protective Order. Indeed, Apple has compromised on a number of provisions. A few disputes remain, however, and Apple believes that a small extension of the page limit is necessary for it to fully explain the reasoning for its proposals.






claim scope during prosecution." *Id.* at 1380–81. These "competitive decisionmaking" activities are not restricted only to original prosecution of a patent; rather, they are all activities in which EPL's litigation counsel would be able to participate—in the *inter partes* review, post-grant review, or reexamination proceedings—under its proposed prosecution bar.

Once a prosecution bar is deemed appropriate, a party, such as EPL, seeking exemption must show on a counsel-by-counsel basis:

> (1) that counsel's representation of the client in matters before the PTO does not and is not likely to implicate competitive decisionmaking related to the subject matter of the litigation so as to give rise to a risk of inadvertent use of confidential information learned in litigation, and (2) that the potential injury to the moving party from restrictions imposed on its choice of litigation and prosecution counsel outweighs the potential injury to the opposing party caused by such inadvertent use.

*Id.* at 1381. EPL's proposed exemptions from the prosecution bar, however, do not satisfy either of these prongs.

First, EPL seeks an exception to the prosecution bar that would allow its litigation counsel to participate fully in *inter partes* and post-grant reviews, with no restrictions. But as mentioned above, these review proceedings regularly involve each of the activities that the Federal Circuit considers to be indicative of competitive decisionmaking.

Second, EPL also seeks an exception to the prosecution bar for reexamination proceedings, which also involve these same activities, as long as certain conditions are met, such as that EPL's litigation counsel may not "directly" prosecute the reexamination or disclose protected materials to reexamination counsel. EPL's qualified exception for reexaminations, however, is unjustified under *In re Deutsche*. EPL's proposal would allegedly restrict its litigation counsel from "directly" prosecuting the reexamination or disclosing protected materials to reexamination counsel. As a practical matter, however, this carve out would be nearly impossible for EPL's counsel to implement or for Apple to monitor. First, it is entirely unclear what "directly prosecute" even means. Second, the provision assumes that EPL's counsel can perfectly compartmentalize its knowledge of Apple's confidential information. Even a good-faith attempt to comply with EPL's proposed provision would present a risk of inadvertent disclosure. Moreover, there would be no way to verify that counsel has complied with EPL's provision. EPL's proposed language would effectively render the prosecution bar meaningless for reexamination proceedings. There is nothing in the provision that would bar EPL's counsel from meaningfully participating in the process of drafting or amending claims by, for instance, instructing a non-barred counsel as to how to draft or amend the claims in a deliberate attempt to cover Apple's products while avoiding prior art. This is the precise activity that the prosecution bar is designed to prevent.

Apple's provision, in contrast, allows litigation counsel to participate in reexamination proceedings only on behalf of parties *not* prosecuting the patent, such as litigation counsel for parties challenging the validity of the patent. These litigation counsel are not involved in competitive decisionmaking because they cannot amend or draft claims. For example, challenging the validity of a patent does not involve amending or drafting claims, and access to confidential information cannot be used to influence claim scope. Apple's proposal therefore comports with the standard set forth in *In re Deutsche*.

With respect to the acquisition of patents, EPL's position that it needs its outside counsel to be involved in strategic decision-making about the acquisition of patents is *precisely* the reason why such counsel should be distinct from those with access to Apple's highly confidential information. It would be highly injurious and prejudicial to Apple to allow EPL to use Apple's highly confidential information to acquire patents to assert against Apple's products. It would be similarly prejudicial to Apple to allow other companies (besides EPL) that are advised by EPL's litigation counsel who have access to Apple's confidential information to use that information to






acquire patents for assertion against Apple's products. Choosing what patents to buy to be able to extract licensing revenues implicates the same competitive-decision-making concerns that justify the remainder of the prosecution bar.

C. <u>Source Code Protections</u>

Apple's source code is its most valuable asset. As one of the largest and most highly publicized companies in the world, Apple's trade secrets are extremely sought after. Apple's competitors and the "tech blogosphere" (i.e., the community publishing the latest technology releases, leaks, and rumors) daily search for and broadcast virtually every scrap of activity they can learn about Apple's products and activities. If Apple's most sensitive trade secrets—its source code—were to be disseminated in any manner, even inadvertently, Apple would face potentially devastating competitive harm. Furthermore, the confidentiality of Apple's source code helps it to keep it products secure from hacking and other threats, such as viruses. Any breach of security would result in grave and irreparable harm that could affect not only Apple, but millions of consumers.

Despite this, EPL seeks to significantly weaken the protections provided for source code for reasons that amount to nothing more than mere conjecture. For instance, EPL is proposing that it: (1) be allowed to bring recordable media or recording devices, such as cameras or hard drives, into the source code review room; (2) be allowed to print as many as fifty contiguous pages of Apple's source code, which in many instances is the entire set of source code relating to the accused functionality; (3) be allowed to transmit Apple's source code electronically; and (4) be allowed to retain indefinitely materials containing Apple's source code. These proposals, especially when viewed together, dramatically increase the risk that at least some portion of Apple's source code will at some point be disseminated to the public. And the only reason that EPL has conveyed to Apple as to why such proposals are necessary is that EPL is concerned that Apple will somehow use the protections in the Protective Order to interfere with EPL's ability to review and use source code. EPL has no basis, however, to believe that Apple would engage in any such conduct. Indeed, IP Nav, the licensing entity driving this action against Apple, has been involved in other suits against Apple where the parties agreed to provisions similar to that which Apple is proposing here, and the potential for "abuse" that EPL claims support its proposals never materialized in any of those matters.

1. <u>Paragraph 9(c): Use of Computers During Source Code Review</u>

EPL's proposal disregards entirely the extremely sensitive nature of Apple's source code, refusing to agree to language in Apple's proposal restricting experts from bringing into the source code review room "recordable media or recording devices, including . . . sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives." The presence of such insecure electronics—including cameras and portable hard drives—in the source code review room undermines entirely the source code review procedures set forth in the remainder of the Protective Order, which prohibit capturing confidential information for transport elsewhere in an insecure manner. Furthermore, EPL has offered absolutely no explanation as to why its experts should be permitted or would need to bring any such devices into the secure source code review room.

In addition to not agreeing to the restriction on recordable media and recording devices, EPL insists that its experts be permitted to bring their own insecure laptops into the source code review room. Under this proposal, Apple would have no way of ensuring that the laptops are, and remain, unconnected to any wireless or wired network, or that the laptops do not contain a functioning camera. Furthermore, Apple has offered to provide to EPL's experts a secured computer on which they may take notes at Apple's source code review site. Apple would <u>not</u> be able to review the notes taken on this computer, because (i) all notes on the computer would be encrypted, and (ii) all notes would be provided electronically to EPL's expert at the end of each day on which the notes were created and subsequently deleted from the computer. The Apple-provided computer would provide reasonable security protections to Apple's code, because the






computer would be inaccessible through the Internet or through network connections to other computers. Furthermore, under Apple's proposal, this notes computer would be the only recordable media or recordable device allowed in the review room.

The risk of an intentional or inadvertent violation of the Protective Order greatly outweighs the minor inconvenience of having to take notes on a secure computer. EPL's experts will have access to their notes at all times and can monitor the secure transfer and deletion of these notes to confirm that any work product remains confidential. While EPL's proposal may be marginally more convenient for its experts, any nominal increase in convenience as compared to using a notes laptop that Apple provides is vastly outweighed by the risk to Apple that it will suffer irreparable harm as a result of its source code being leaked. Notably, the Court's Interim Model Protective Order does not allow for taking notes on any laptop whatsoever, let alone one that could connect to a network.

2. Paragraph 9(e): Source Code Printing

Because the parties may need to use excerpts of source code as evidence, for example in briefing to the Court, Apple has provided a procedure for printouts of source code. Apple's proposal allows EPL to print up to five contiguous pages of Apple's source code, with no absolute limit on the number of total pages that EPL can print. EPL can print more than five contiguous pages of source code if it demonstrates that the printouts are reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere. The Protective Order prohibits review and analysis of source code elsewhere because printing large swaths of code and transporting the printouts elsewhere would defeat the protections provided for source code review.

EPL's proposal undermines the agreed-upon protections for source code, however, by refusing any printing "limitation" less than fifty continuous pages. EPL argues that it cannot agree to any limit less than fifty pages without first seeing Apple's source code. But a printing "limit" of fifty continuous pages of source code is really no limit at all. In many instances, fifty pages would include the entire set of source code relating to the accused functionality. Thus, EPL's proposal would allow it to print substantial amounts of source code, transport the pages elsewhere, and defeat the protections intended by use of the source code computer.

In addition to not agreeing to any meaningful limit on the printing of contiguous pages of source code, EPL seeks to shift to the producing party the burden to: (1) move the Court for relief where a dispute exists regarding printed source code, and (2) prove that the receiving party's source code printing is reasonably necessary. Shifting the burdens in this manner, however, would require the producing party to establish facts solely within the knowledge of the receiving party—i.e., why the printed portions of the code are no more than is reasonably necessary for a permitted purpose. For these reasons, EPL's provision should be rejected.

3. Paragraph 9(k): Electronic Images/Copies of Source Code

Electronic copies of source code pose the most significant risk of inadvertent disclosure because they are easily copied and transmitted. Nevertheless, Apple recognizes that there may be certain limited circumstances where it becomes necessary to present electronic copies of excerpts of source code to the Court. Under Apple's proposal, if a party reasonably believes that it needs to submit source code as part of a Court filing, the parties must meet and confer as to how to make such a filing while protecting the source code confidentiality. Because the Court is not normally required to make determinations based on its own review of source code, it is unlikely this procedure will be required more than once or twice over the course of this litigation.

EPL proposes that it be allowed to submit Apple's source code to the Court under seal in court filings without Apple's prior knowledge. EPL's proposal necessarily involves making and transmitting an electronic copy of any source code that is submitted because this Court requires electronic filing of submissions. Thus, any submitted source code would be transmitted over the public Internet and stored on the Court's servers. This could lead to disastrous results if the





transmission is intercepted or the Court's servers are compromised. Moreover, an inadvertent public filing, or a confidential filing that inadvertently became public, could render Apple's highly confidential and sensitive source code publicly available instantaneously. Indeed, the Internet is filled with examples of the improper and unlawful distribution of everything from court records to copyrighted music. Even with well-conceived safeguards, electronically stored files can be copied, disseminated, hacked into (if on a networked computer), or altered, all without detection. As described above, any breach of security would result in grave and irreparable harm that could affect not only Apple, but millions of consumers.

To avoid such a catastrophic disclosure, Apple simply proposes that the parties meet and confer about a party's intention to file source code before the source code is filed. EPL argues that this procedure is onerous, but the procedure is no more than a conference to discuss the specific circumstances requiring creation of an electronic copy of source code. Apple's proposal will ensure that a party knows what parts of its source code are being electronically transmitted to and stored by the Court. It would also permit a party to confirm that any submission contains only those portions of the source code necessary for that particular submission and to propose alternative ways of providing source code for the Court's review. Accordingly, proactive communication between the parties should be required before digital copies of source code are created and transmitted electronically.

4. <u>Paragraph 15: Final Disposition (Source Code)</u>

The parties agree that upon final disposition of this action they should each be able to retain an archival copy of case materials such as pleadings, correspondence, and attorney and consultant work product, even if those materials contain the opposing party's confidential information. Apple's proposal, however, recognizes what is reflected elsewhere in the Protective Order—that source code is often a party's most carefully guarded trade secret—and thus prescribes that a party may not retain an archival copy of case materials that contain source code.

Allowing a party to retain source code indefinitely substantially increases the likelihood that the source code is eventually leaked, even inadvertently, to the public. The Protective Order sets forth an extensive set of procedures and rules regarding the treatment of source code. But a party is unlikely to diligently follow those procedures for years after a case has concluded. As time passes, a number of things take place that lead to very little accountability for any archival materials. For instance, case materials routinely get sent to off-site storage facilities after a matter ends. But there is no way to confirm that access to these storage facilities is restricted to the same individuals who otherwise were allowed access to source code under the Protective Order. Furthermore, files get lost over time, attorneys change law firms, and law firms even dissolve, all of which increase the likelihood that source code is unaccounted for or otherwise left unprotected and eventually leaked.

Even if a source code leak were not to take place for many years, Apple would certainly suffer irreparable harm at that time, as it is not uncommon for a company to continue to use the same source code for many years. While a party should be able to maintain a copy of its work product, any minimal harm that EPL claims it would suffer as a result of having to return/destroy Apple's source code is far outweighed by the harm Apple would suffer if its source code were leaked, even years from now.

* * *

For the reasons discussed above, the Parties request the Court resolve the disputed provisions and enter a protective order.






Very truly yours,

_/s/ Marc Fenster_
Marc Fenster
Lead Counsel for EPL Holdings, LLC

_/s/ Michael Jay_
Michael Jay
Lead Counsel for Apple Inc.