RUSS AUGUST & KABAT
Marc A. Fenster, CA SB #181067
E-mail: mfenster@raklaw.com
Brian D. Ledahl, CA SB #186579
E-mail: bledahl@raklaw.com
Payam Moradian, CA SB #276952
E-mail: pmoradian@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone:  310/826-7474
Facsimile:  310/826-6991

Attorneys for Plaintiff,
EPL HOLDINGS, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

EPL HOLDINGS, LLC,

    Plaintiff-Counterclaim Defendant,

    v.

APPLE, INC.,

    Defendant-Counterclaimant.

No. 12-cv-04306 (JST)

**OPENING CLAIM CONSTRUCTION BRIEF OF PLAINTIFF EPL HOLDINGS, LLC**

**Judge: Hon. Jon S. Tigar**

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

**TABLE OF CONTENTS**

I.      INTRODUCTION……………………………………………………………1

II.     BACKGROUND………………………………………………………..2

III.    CLAIM CONSTRUCTION PRINCIPLES……………………………..3

        A.      Not Every Term Needs Construction…………………………………..4

        B.      Claim Terms Should Be Given Their Ordinary Meaning……………..4

        C.      Intrinsic Evidence Controls Claim Construction……………………...5

        D.      Limitations Should Not Be Imported From The Specification…………..6
        E.      Independent Claims Should Not Be Limited To The Elements Of A
                Dependent Claim……………………………………………………7

IV.     DISPUTED CONSTRUCTIONS – '769 PATENT……………………………..8

        A.      "Determining An Input Block of W Signal Representations From The
                Input Stream"………………………………………………………8

                1.      This phrase does not require construction…………………..8
                2.      Apple's proposed construction restricts the claim to a particular
                        embodiment……………………………………………………10
                3.      Apple's proposed construction would exclude a preferred
                        embodiment……………………………………………………11
                4.      Apple's proposed construction improperly imports limitations from
                        a dependent claim……………………………………………12
                5.      Apple unduly relies upon extrinsic evidence………………...13

        B.      "Wov"…………………………………………………………......15

                1.      The specification describes parameters as "representing" not
                        "fixing" an attribute or value………………………………...16
                2.      Apple's proposed definition injects confusion……………….16

        C.      "determined by"……………………………………………………...17

                1.      This phrase does not require construction…………………...17
                2.      Apple's definition is not consistent with usage throughout the
                        claims…………………………………………………………18
                3.      Apple relies on conclusory extrinsic expert testimony, not proper
                        intrinsic evidence……………………………………………18

        D.      "W"…………………………………………………………………...19

                1.      Parameters represent, rather than fix, attributes…..…………19
                2.      The second part of Apple's proposed construction is unnecessary
                        and confusing………………………………………………19

        E.      "Ss"………………………………………………………………...20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

1.      Apple's addition of "fixes" is improper and unsupported……21
2.      EPL's definition is an express definition from the patent specification……………………………………………………..21

F.     *"time scale modification/time scale modifying"*…………………..21

1.      EPL proposes a clear definition from the specification……...22
2.      Apple's added language "without modifying its pitch" is inconsistent with the patent specification…………………....22
3.      Apple's added "without modifying its pitch" definition is inconsistent with the use of the term in the claims………….23

V.     DISPUTED CONSTRUCTIONS – '903 PATENT FAMILY…………………..24

A.     *"Current Time"*…………………………………………………..24

1.      EPL's definition comes directly from the patent specification………………………………………………………..25
2.      Apple's definition is inconsistent with the specification…….25

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)....... 7

*Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) ................................ 5

*Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) ................................ 4

*Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) ................................................ 4

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004)...................................................................................................................... 5, 7

*Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001)........... 7, 11

*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ...................... 9

*JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ...................... 5

*Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ........................... 7

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)................. 3, 6, 10

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001............ 4

*Netflix, Inc. v. Blockbuster, Inc.*, 477 F. Supp. 2d 1063, 1068 (N.D. Cal. 2007) .......................... 4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) 8

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ........................................... passim

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005)................. 6, 10

*Purdue Pharma L.P. v. Endo Pharm, Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) ...................... 5

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)...................... 5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ................................ 4

*Thorner v. Sony Computer Entertainment LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ............... 6

*Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010)............. 7, 10

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)............................. 4, 8

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ............................. 13

## I.      INTRODUCTION

Computers and digital technology have provided many new ways to store and playback a variety of different types of media, including, for example, audio such as music, or recorded speech.  Consumers of such media sometimes need to change the speed of playback of the material.  This can be useful, for example, when listening to recorded speech (such as an audiobook) in order to speed up the playback and reduce the time needed to listen to the book while still comprehending the material it contains.  Recognizing the importance of such features for podcasts, audio books, learning materials, and video, Apple has incorporated them into many of its devices that facilitate media playback, including its popular iPhone and iPad devices, as well as its computers.

Plaintiff EPL Holdings, LLC ("EPL") asserts four patents in this case that facilitate these features.  The asserted patents can be grouped into two categories.  The first, U.S. Patent 5,175,769 (the "'769 patent"), relates to a method for altering the playback speed of a signal (such as an audio signal) in a way that will not alter its pitch.  Using the analogy of a record player with multiple speeds, it is generally understood that if a user played a 45 RPM record on the 78 RPM setting, the audio would speed up, and the pitch would also go up (resulting in the recording sounding like the animated Alvin and the Chipmunks characters).  If one played the same 45 RPM record on the 33 RPM setting, the audio would slow down, and the pitch would also be lower.  The '769 patent discloses a method for manipulating a signal by changing its duration to effectively alter its playback speed by overlapping certain portions of the audio, so that the resulting pitch is not changed.

The other three patents-in-suit, all derive from a common parent application and share a specification.  Those patents, U.S. Patent 7,683,903 (the "'903 patent"), U.S. Patent 8,345,050 (the "'050 patent"), and U.S. Patent 8,384,720 (the "'720 patent") all relate to methods and devices for rendering, or playing back, media files and the types of technological adaptations that are necessary to allow those files to be rendered correctly, even when they are played back at faster or slower speeds than they were recorded.

1

The parties have identified seven terms or phrases about which they dispute the proper construction. As to two of these terms or phrases, EPL contends that they require no construction and have a sufficient meaning without rewriting or re-interpretation. As to others, EPL relies upon straightforward meanings set forth explicitly in the relevant patent specifications. Apple offers constructions that modify the clear meaning of terms set forth in the patents and seeks to import extraneous limitations into the patent claims. Such importation of extraneous limitations is not consistent with the well-established principles governing claim interpretation, and should be rejected here in favor of the straightforward interpretations offered by EPL, which derive directly from the specifications and do not impermissibly modify the claims from the scope as written.

## II.    BACKGROUND

Plaintiff EPL is the successor to Enounce, Incorporated, a company founded in 1998 by Donald Hejna, inventor of the asserted '769 patent. EPL holds the patent rights relating to several Enounce technologies, including Enounce's Variable Speed Playback software product called MySpeed. MySpeed software allows users to interactively increase or decrease the playback speed of videos, such as videos found on YouTube, from 0.3x the original speed, to 5x the original speed. This technology allows users to speed up content in order to save time while still comprehending material, or to slow down content (such as a recorded lecture or tutorial) for greater understanding or ease in transcribing. The technology also helps when listening to material in a foreign language.

All but one of the terms or phrases disputed by the parties are found in the '769 patent. That patent, entitled Method For Time-Scale Modification Of Signals issued on December 29, 1992 from an original application filed July 23, 1991. The patent was issued by the patent office without rejection by the patent examiner. EPL asserts infringement of claims 1, 2, 10, 11 and 19 of the '769 patent. A copy of the '769 Patent is submitted with the accompanying Declaration of Brian Ledahl as Exhibit A.[1] The basic technology of the '769 patent deals with a method for

---

[1] Unless otherwise indicated, all Exhibit references will be to the Ledahl Declaration.

RUSS, AUGUST & KABAT

1   altering the duration and consequently the speed of playback of media files, such as audio by a

2   particular method outlined in the claims.  The patent specification contains examples of

3   techniques that can be implemented to alter playback speed without altering the pitch of the

4   signal.

5        The sole remaining claim term in dispute, "current time" is found in the three remaining

6   patents, the '903 patent, the '050 patent, and the '720 patent.  All three of those patents share the

7   same specification.  A copy of the '903 patent is submitted as Exhibit B, a copy of the '050

8   patent is submitted as Exhibit C, and a copy of the '720 patent is submitted as Exhibit D.  For

9   simplicity, in discussing this term EPL will refer to citations from the specification of the '903

10  patent, though the same passages appear in each of these three patents.  EPL asserts infringement

11  of claims 1, 3, 4, 6, 12, 13, 16 and 22 of the '903 patent, claims 1, 3, 4, 5, 8, 10, 13, 15, 16, 17.

12  20, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 36, 37, 38, 39, 40, 41, 42, 43, 44, 47, 48, 49 and 50 of

13  the '050 patent, and claims 1, 6, 7, 10 and 11 of the '720 patent.  The '903 patent family relates

14  to computer implementations of systems for rendering media files, such as audio files, and the

15  technical issues that are involved in changing the playback speed of those files because different

16  components of the system require different information about the current location in the media

17  file being played back and the amount of data required.  For example, if an audio file is played

18  back at twice its normal speed (2x), then two minutes of the recorded file would be played back

19  in one minute of presentation time.  The '903 patent family addresses the need to provide

20  different components of the rendering system with the correct measure of time relevant to that

21  component – some components require the amount of elapsed presentation time (one minute to

22  play the sped-up material in this example), while others require the amount of elapsed content or

23  data time (two minutes of original source material before the processing occurs in this example).

24  **III.    CLAIM CONSTRUCTION PRINCIPLES**

25       Interpreting the proper meaning and scope of a patent claim is a question of law

26  exclusively for the Court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-

27  71 (Fed. Cir. 1995).  "In claim construction the words of the claims are construed independent of

28

3

the accused product, in light of the specification, the prosecution history, and the prior art." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). "The construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims." *Id.*

### A. Not Every Term Needs Construction

All words have definitions and may theoretically be defined. This does not mean that all words need to be defined. Simply put, claim construction is "not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Where a term is used in accordance with its plain meaning, the court should not re-characterize it using different language. *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001). When claim terms are clear on their face, and there is no legitimate dispute regarding their meaning, no construction is necessary. *Netflix, Inc. v. Blockbuster, Inc.*, 477 F. Supp. 2d 1063, 1068 (N.D. Cal. 2007) ("A district court need not construe every single disputed word"). Commonly-understood English words "need no clarification." *Id.* As these precedents make clear, the mere fact that one party proposes an interpretation of a particular term does not mean that there is a genuine dispute requiring the Court to depart from the claim language itself.

### B. Claim Terms Should Be Given Their Ordinary Meaning

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotes omitted). While other evidence may be useful to put claim language in context, "the claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). There is "a heavy presumption that claim terms carry their full ordinary and customary meaning, unless [the accused infringer] can show the patentee expressly relinquished claim scope." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date

4

RUSS, AUGUST & KABAT

of the patent application." *Phillips*, 415 F.3d at 1313.  The task of comprehending the claims is not always difficult – it often "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

## C.    Intrinsic Evidence Controls Claim Construction

The specification is "the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315.  However, courts cannot "import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment." *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005). The rationale for this rule is straight-forward: "[i]f everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).  "Accordingly, particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

In addition to the specification, the court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* However, because the prosecution history represents an "ongoing negotiation" rather than the "final product" of the negotiation, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*  The prosecution history only limits the claims when the patentee's intent to surrender claim scope was "clear and unmistakable." *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003).  This standard is met when the patentee "explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharm, Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)

OPENING CLAIM CONSTRUCTION BRIEF          Case No. 12-cv-04306 (JST)

1   (finding no disavowal of claim scope where inventors touted a feature to overcome the prior art,

2   but that feature was not described as a "necessary feature" of the claimed formulations).

3       "Extrinsic evidence," such as expert and inventor testimony, dictionaries, treatises, and

4   other evidence external to the patent and prosecution history may also be considered in claim

5   construction. *Phillips*, 415 F.3d at 1317. The Federal Circuit has made clear, however, that

6   extrinsic evidence is "less significant than the intrinsic record in determining the legally

7   operative meaning of claim language." *Id.* (internal quotes omitted). A court may rely on

8   extrinsic evidence "in order to better understand the underlying technology and may also rely on

9   dictionary definitions when construing claim terms, so long as the dictionary definition does not

10  contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at

11  1322-23.

12          **D.      Limitations Should Not Be Imported From The Specification**

13      Claim construction is not an exercise in using the specification to limit patent claims.

14  "The written description part of the specification itself does not delimit the right to exclude.

15  That is the function and purpose of claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d

16  967, 980 (Fed. Cir. 1995). The Federal Circuit repeatedly confirms that claim construction

17  should not import additional limitations into patent claims from the specification. Claim

18  construction may deviate from the ordinary and customary meaning of a disputed term only if (1)

19  a patentee sets out a definition and acts as his own lexicographer, or (2) the patentee disavows

20  the full scope of a claim term either in the specification or during prosecution. *Thorner v. Sony*

21  *Computer Entertainment LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To limit the claims, the

22  Federal Circuit requires specific statements clearly showing an intent to limit the claims, stating

23  "the claims of the patent will not be read restrictively unless the patentee has demonstrated a

24  clear intention to limit the claim scope using **words or expressions of manifest exclusion or**

25  **restriction**." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005)

26  (emphasis added).

27

28

RUSS, AUGUST & KABAT

6

RUSS, AUGUST & KABAT

While a patent specification may describe one or more preferred embodiments, the claims should not be limited to particular preferred embodiments from the specification.  "The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."  *Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009).  Indeed, "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  Similarly, although a patentee refers to the "present invention" in the specification, such statements do not allow importing limitations into the claims.  *Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010).

Claims should also not be limited to exclude a preferred embodiment disclosed in the patent specification.  A claim construction excluding a preferred embodiment "would require highly persuasive evidentiary support."  *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003).  "[A] construction [that] would not read on the preferred embodiment . . . would 'rarely, if ever, [be] correct and would require highly persuasive evidentiary support.'"  *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001).

**E.    Independent Claims Should Not Be Limited To The Elements Of A Dependent Claim**

Where an independent claim has dependent claims that add limitations, those limitations should not be interpreted to be part of the independent claim.  As the Federal Circuit stated in the *Phillips* case, "[t]he presence of a dependent claim that adds a particular limitation gives rise to a

7

presumption that the limitation in question is not present in the independent claim." *Phillips v.*

*AWH Corp.*, 415 F.ed 1303, 13l4, 1315 (Fed. Cir. 2005).

## IV.    DISPUTED CONSTRUCTIONS – '769 PATENT

### A.    "Determining An Input Block of W Signal Representations From The Input Stream"

This claim element (or the similarly-worded "determining an input block of signal representations from the input stream") appears in asserted claims 1, 10 and 19 of the '769 patent.  The parties' respective constructions are set forth below.

| EPL's proposed construction | Apple's proposed construction |
|---|---|
| Plain and Ordinary Meaning, subject to the term "W" defined separately | searching for and identifying the starting position of an input block of W signal representations that is similar to the output stream/searching for and identifying the starting position of an input block of signal representations that is similar to the output stream. |

### 1.    This phrase does not require construction

As the Federal Circuit states, claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  The Court need not apply a new construction to a term or phrase that can be readily understood and which uses common language.  The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  EPL respectfully submits that the Court should particularly avoid attempts to rewrite entire claim elements in the

RUSS, AUGUST & KABAT

guise of claim construction as this presents a significant risk of improperly altering the scope of the claim.

The claim language uses the words "an input block of W signal representations" or "an input block of signal representations." Apple's proposed construction retains these portions of the claim language unaltered. Apple's construction, however, replaces the word "determining" with "searching for and identifying the starting position of" and further adds that the signal representations must be "similar to the output stream." The claim language as written does not need the further "defining" that Apple seeks. Indeed, that "definition" is actually an attempt to import extra limitations into the claims. The word "determining" does not connote all of the additional limitations that Apple ascribes to it with this proposed re-write. Indeed, elsewhere, in the very same claim, Apple contends that the words "determined by" mean "uniquely specified by." *See* Joint Claim Construction Statement at 4-5. Here, however, Apple abandons its own proposed interpretation of the root word "determine" and seeks to re-write the claim element. Essentially, Apple seeks to confine the general descriptive term "determining" to a particular, narrow meaning. The Federal Circuit warns against just such an approach: "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

Nothing in the phrase "determining an input block of [W] signal representations from the input stream" indicates that 1) the determination must be made by the specific process of searching and identifying as Apple asserts, or 2) that they must meet some similarity measure to the output stream as Apple's definition would also require. The claim language does not restrict itself to the particular method of determining an input block that Apple asserts. Apple seeks to import these additional limitations into the claim from the specification. As set forth in greater detail in the following sections, Apple cannot carry the heavy burden to show that the claim should be further limited as it argues.

9

1

2. **Apple's proposed construction restricts the claim to a particular**
**embodiment**

2

3      As discussed previously, while the specification of a patent may be helpful in

4  understanding the invention, "[t]he written description part of the specification itself does not

5  delimit the right to exclude.  That is the function and purpose of claims."  *Markman v. Westview*

6  *Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).  The Federal Circuit cautions that "although

7  the specification often describes very specific embodiments of the invention, we have repeatedly

8  warned against confining the claims to those embodiments."  *Phillips v. AWH Corp.*, 415 F.3d

9  1303, 1323 (Fed. Cir. 2005).

10      Apple's proposed construction of this claim element violates these repeated cautions by

11  seeking to import a particular embodiment from the specification into the claims.  Here, Apple

12  appears to rely heavily on certain examples from the specification that involve a particular

13  method of determining an input block.  Apple points to examples in the specification that refer to

14  searching for and identifying the starting position of an input block and argues that as a

15  consequence, the claim language should be limited to those examples.  Apple's designated

16  expert, Dr. Smith, makes a similar argument, simply pointing to various passages in the

17  specification that are consistent with Apple's narrowing interpretation of the claim language.

18  Some of those passages, Apple and its expert assert, refer to the "present invention."  However,

19  the Federal Circuit holds that even where a patentee makes reference to the "present invention"

20  in the specification, such a reference does not allow importing limitations into the claims.

21  *Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010).

22      Instead, to limit claims based on disclosures in the specification, Apple must point to

23  words that demonstrate "a clear intention to limit the claim scope using words or expressions of

24  manifest exclusion or restriction."  *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284,

25  1289 (Fed. Cir. 2005).  Apple simply cannot point to any such words.  It can point to examples in

26  the specification, but none of those examples use words of manifest exclusion or restriction to

27  state that they represent the only way to implement the invention.  Apple and its expert simply

28

OPENING CLAIM CONSTRUCTION BRIEF          Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

focus on particular examples and argue that those examples should limit the claims.  Clear

precedent from the Federal Circuit (including that cited above) confirms that this is not the

proper way to construe patent claims.

### 3. Apple's proposed construction would exclude a preferred embodiment

"A construction [that] would not read on the preferred embodiment . . . would 'rarely, if ever, [be] correct and would require highly persuasive evidentiary support.'"  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001).  Here, Apple's proposed construction would exclude a preferred embodiment from the '769 patent.  Apple's expert, Dr. Smith, explains that he supports Apple's proposed construction because the specification describes performing the determining step of the patented method by essentially a 3-step process: 1) starting with an input block of size W (a parameter for the analysis window size) plus a search region referred to by the parameter Kmax, 2) searching that block for a particular group of signal representations that have a maximum similarity to a group of the same size in the output signal (the size of the group is defined by the amount of overlap needed for the particular modification), and 3) choosing the precise input block of size W that contains the group with the maximum similarity for overlap.  *See, e.g.*, Smith Decl., ¶ 47; Smith Depo. (Ledahl Decl., Ex. E) at 97:6-101:12.

Apple and Dr. Smith assert that because certain examples in the specification use these three steps as part of the determining step, that concept should be incorporated into the language of claim 1, as set forth in Apple's proposed definition.  The '769 patent, however, discloses a different preferred embodiment where these steps are not performed.  In particular, the patent discloses an embodiment in which searching and the performance of a similarity measure is not needed, because the correct interval can simply be predicted.  For example, the '769 patent discloses that "[a]n important attribute of the SOLAFS method is that the starting position which provides the maximum similarity over the range of possible starting positions for a given input block can often be determined **without evaluating the similarity measure** for all possible

RUSS, AUGUST & KABAT

starting positions." '769 patent, Col. 5:42-47 (emphasis added). The patent refers to this approach as "prediction." As the specification notes, "[a]n advantage which occurs in accordance with the present invention occurs as a result of the fact that the shift distance Km which maximizes the similarity in the overlap region can often be predicted **without computation of the similarity**." '769 patent, Col. 10:21-25 (emphasis added). Apple's construction, and its purported basis for the construction, would exclude this preferred embodiment of the '769 patent, and thus violate a core principle of claim construction articulated by the Federal Circuit.

### 4. Apple's proposed construction improperly imports limitations from a dependent claim

As described above, Apple's proposed claim construction assumes that the determining step must involve a 3 step process. Apple bases this position on particular embodiments within the specification. As shown above, the particular embodiments upon which Apple relies are not the only way that the determining step can be performed. Thus, the language appearing in independent claims 1, 10 and 19 should not be limited to the particular embodiment advocated by Apple. The other, dependent, claims of the '769 patent bear out that Apple asks the Court to improperly import a limitation.

In particular, dependent claim 3 of the '769 patent expressly recites that the determining step of claim 1 may be performed using the very steps that Apple contends should limit claim 1. "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005). Apple's expert, Dr. Smith, admitted that the basis for Apple's proposed construction of the "determining" step is that he believed that these three steps were "the only way" that he understood claim 1 to operate. Smith Depo. (Ex. E), at 97:6-101:25. Dr. Smith's analysis, however, fails to appreciate that these specific three steps are particularly claimed in dependent claim 3. Thus, claim 1 necessarily includes other possible ways to perform

12

RUSS, AUGUST & KABAT

the determining step, otherwise claim 3 would be mere surplussage.[2]  Claim 3 may specifically claim the particular embodiment that Dr. Smith has focused upon, but that cannot be used to limit the scope of claim 1.

### 5.    Apple unduly relies upon extrinsic evidence

Apple relies heavily on two types of extrinsic evidence to support its positions.  First, it depends heavily on testimony of a paid expert to simply state his views of what the claims mean. Since claim interpretation is a question of law for the Court, such completely extrinsic evidence should be given little or no weight.  "Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court [] resort[] to extrinsic evidence, such as expert testimony, in order to construe [a] claim."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).  The Federal Circuit went on to state that "where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."  *Id.*  "Conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).  The Federal Circuit explained that testimony like Dr. Smith's – "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence."  *Id.*

The problem with Dr. Smith's testimony is that it provides just the type of extrinsic evidence that the Federal Circuit warns is "not useful" – conclusory assertions about the meaning of claim terms prepared for the purpose of litigation.  Dr. Smith simply recites legal principles of claim construction in his declaration and then offers his statement of how the claims should be construed.  Dr. Smith's declaration is particularly unreliable because deposition testimony revealed that he does not even understand the principles he purports to apply.  For example, Dr. Smith recited in his declaration that "I have been informed that there may also be a clear disavowal of claim coverage in the specification or prosecution history."  Smith Decl., ¶ 22.

---

[2] Apple may contend that claim 3 can be ignored because it further modifies dependent claim 2, not claim 1 directly.  Claim 2, however, incorporates claim 1 and all of its limitations, so if claim 1 were limited as Apple argues, claim 2 would have the same limitations, and claim 3 would still be rendered mere surplus.

13

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

When asked whether he applied this principle at any point in his analysis, Dr. Smith was unable to understand what the principle meant or how it might have been applied.  In deposition, Dr. Smith stated, "I guess I want to know what does it mean legally to have a clear disavowal of claim coverage in this specification."  Smith Depo. (Ex. E) at 66:7-25.  Dr. Smith went on to state that, "I signed the declaration not being aware that that particular phrase had been applied because I don't know – I've been informed that there's a clear disavowal.  Now you're asking me to apply it.  Being informed about it is one thing but then being asked to apply it specifically is another."  *Id.* at 67:1-19.  Dr. Smith further asserted that he applied this principle not by looking for words of manifest exclusion, as the Federal Circuit mandates, but by concluding that "claim coverage is disavowed by virtue of accepting a more limited definition of a term by **implying** a more limited definition of a term in the specification or prosecution history."  Smith Depo. (Ex. E) at 71:9-19 (emphasis added).  Purportedly implying a particular narrow definition of a term is a far cry from the words of manifest exclusion that the Federal Circuit requires to find a narrowing of claim scope in the specification.  Dr. Smith did not apply the principles recognized by the Federal Circuit, and his opinions cannot be used to narrow the claims as Apple argues.

Apple's clear approach of simply providing a technical expert with legal principles of claim construction that he does not understand and then purporting to rely on his incorrect application of those principles is utterly unreliable and cannot support Apple's claim constructions.  The error of Apple's reliance on the extrinsic evidence of its expert's testimony is compounded by the fact that the expert relies on a second type of extrinsic evidence – publications outside the file history of the patent which were not incorporated by reference into the patent specification.  Dr. Smith states in his declaration that he is also relying upon other publications by one or more inventors of the '769 patent that are not part of the intrinsic record – specifically, Mr. Hejna's MIT thesis, and a paper authored by the two inventors (the Hejna & Musicus paper).  *See* Smith Decl., ¶ 16.  Dr. Smith and Apple apply a particularly pernicious type of improper extrinsic analysis here to support Apple's proposed construction.  Dr. Smith

14

considered extrinsic evidence which describes a method referred to generally as SOLAFS.  The '769 patent also uses the term SOLAFS to refer to methods in the patent.  Apple and Dr. Smith attempt to extract the gist of the SOLAFS method described in extrinsic evidence like the Hejna thesis or the Hejna and Musicus paper, and then graft that concept as a limitation onto the claims in the '769 patent.  In essence, Apple and Dr. Smith seek to rewrite the claims to recite the SOLAFS method (or a particular embodiment of it) as Dr. Smith understands it from the extrinsic evidence.  The claims are not so limited, and the claims, not the extrinsic evidence should form the basis for the Court's construction.

**B.    "Wov"**

The claims of the '769 patent contain several parameters referenced by letters, such as "W", "Wov", and "Ss."  The issues regarding each of these are similar, though they are addressed in discrete sections below for the Court's convenience.  This term appears in asserted claims 1, 2, 10 and 11 of the '769 patent.  The parties' competing constructions are reproduced below:

| EPL's proposed construction | Apple's proposed construction |
| --- | --- |
| a parameter that represents the number of signal representations to be overlapped as determined by W and the time-scale modification. | a parameter that fixes the number of signal representations to be overlapped as determined by W and the time-scale modification. |

As the Court can readily appreciate, there is only one word of difference between the parties' respective constructions.  EPL construes the term as "a parameter that represents the number of signal representations," while Apple argues that the definition should recite "a parameter that fixes the number of signal representations."  This issue is common to all of the "parameter" claim terms that are in dispute.

OPENING CLAIM CONSTRUCTION BRIEF            Case No. 12-cv-04306 (JST)

1    **1.    The specification describes parameters as "representing" not "fixing"**
2    **an attribute or value**

3    Apple offers little basis or explanation for its proposed construction, but the intrinsic

4    evidence shows that the patent uses the term consistent with EPL's proposed construction.  For

5    example, for various parameters, the patent specification states that "Sa is the analysis shift and

6    **represents** the interframe interval between successive search intervals . . . Ss is the synthesis

7    shift and **represents** the interframe interval between successive windows in the output signal . . .

8    Km is the window shift and **represents** the number of data samples . . . ." '769 Patent, Col.

9    12:46-51 (emphasis added).  There is not a single reference in the specification to a particular

10   parameter "fixing" something.  The specification sometimes refers to a particular parameter

11   being a fixed number during a particular time scale modification, but that is not the same as the

12   parameter fixing that attribute.  The parameter represents the attribute, which is a fixed number.

13   In discussing the Wov parameter, the specification states that "Wov=W-Ss, is the number of

14   points in the overlap region."  EPL's definition matches the use of the Wov parameter in the

15   patent specification.  Apple's definition imports an additional concept that never appeared in the

16   specification.

17   **2.    Apple's proposed definition injects confusion**

18   As shown above, the specification describes Wov to be a parameter value that can be

19   calculated from the values W and Ss.  Thus, it would be possible to set values for W and Ss

20   which would then determine the value of Wov.  The claims use this parameter in a similar way,

21   reciting that Wov is "determined by W and the time-scale modification."  If Wov is determined

22   by these items, arguably they "fix" the number of signal representations to be overlapped, rather

23   than Wov itself.  The patent specification makes clear that these various parameters are

24   interrelated and that altering one would necessarily alter one or more others.  EPL's proposed

25   definition is consistent with this relationship by stating that a parameter represents a particular

26   value.  Apple's proposed definition injects confusion by suggesting that a particular parameter by

27   itself fixes something – suggesting that each parameter may be set separately without regard to

28

RUSS, AUGUST & KABAT

16

the others.  It is not at all clear why Apple proposes this language, but its proposal creates unnecessary confusion.

Apple's expert was able to offer little clarification to help explain this issue.  His declaration is far from consistent, suggesting variously that Wov "establishes" a quantity (¶ 99), and at other times that "Wov is fixed for a particular time scale modification" (¶ 103).  Ultimately, Dr. Smith simply states that the definition should be Apple's proposed definition, and then simply quotes long passages from the patent specification that never use the term as Apple proposes.  *See, e.g.,* Smith Decl., ¶¶ 101, 102.

Dr. Smith was also unable to explain how EPL's proposed construction was inconsistent with any passage in the patent specification.  Smith Depo. (Ex. E) at 160:23-161:7.  He admitted that if W and Ss were set, those would determine the value of Wov.  *Id.* at 161:18-162:3.  When asked whether Wov is fixed or whether it fixes something else, he stated that "it depends what you choose first." *Id.* at 162:16-163:4.  Ultimately, Dr. Smith's testimony simply confirms that Apple's definition creates far more confusion than it resolves.

## C.    "determined by"

This phrase appears in claims 1 and 19 of the '769 patent.  The parties' proposed constructions are shown below:

| EPL's proposed construction | Apple's proposed construction |
| --- | --- |
| Plain and Ordinary Meaning | uniquely specified by |

### 1.   This phrase does not require construction

The words "determined by" are ordinary English words.  Nothing in the specification suggests that they are used in a unique or unusual way.  They appear in the context of claim language reciting that "Wov is determined by W and the time-scale modification" (claim 1) or "where the number appended is determined by the time-scale modification" (claim 19).  These words do not require construction any more than telling someone that their place in line at the DMV is determined by the time at which they arrived, or that a person's Body Mass Index is determined by the person's height and weight.  This is a phrase that has common usage.

17

Defining it adds nothing but excess confusion and potential dispute about what "uniquely specified" actually means. Apple suggests that this definition is somehow necessary, but its expert, Dr. Smith, offers no meaningful explanation of why additional definition is needed. *See* Smith Decl., ¶¶ 121-130.

### 2. Apple's definition is not consistent with usage throughout the claims

Claim terms should generally be given the same meaning when used in multiple instances within the patent claims. As discussed previously, another phrase in dispute in this case is "determining an input block . . . ." There, Apple does not appear to argue that determining means "uniquely specifying," even though here it argues that this is the only acceptable meaning of the root word "determine" in these claims. In the earlier element, Apple argues that "determining" means "searching for and identifying the starting position . . . that is similar to the output stream." Apple's arguments are positions of convenience to support its efforts to avoid infringement, rather than principled positions based on the actual intrinsic evidence of the '769 patent.

### 3. Apple relies on conclusory extrinsic expert testimony, not proper intrinsic evidence

In his declaration, Dr. Smith makes conclusory statements that the intrinsic evidence supports his opinion of the definition of "determined by." *See* Smith Decl., ¶¶ 122-124. None of the passages Dr. Smith cites actually define "determined by," nor use the words "uniquely specified." Dr. Smith further relies on various dictionaries, none of which actually use the definition Apple offers. None of this evidence actually shows that the term "determined by" needs to be construed, and it certainly does not show that Apple's proposed construction is either necessary or correct. To the extent Apple believes that this definition somehow narrows the meaning of the term, it must point to words of manifest exclusion to support such a narrowing. It cannot do so, and thus the Court should not accept Apple's vague, but apparently-narrowing, definition of this phrase.

OPENING CLAIM CONSTRUCTION BRIEF          Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

D. **"W"**

This is another of the parameter terms (like Wov and Ss) and presents similar issues. The term appears in claims 1, 2, 10 and 11 of the '769 patent. The parties' respective constructions are shown below:

| EPL's proposed construction | Apple's proposed construction |
|---|---|
| a parameter that represents the duration of the windowed segments of the input signal. | a parameter that fixes the duration of the windowed segments of the input signal that represents the smallest unit that the time-scale modification method manipulates. |

Like the "Wov" term discussed previously, one of the primary issues regarding this term is Apple's proposal to use the word "fixes" instead of "represents" in the definition. Apple also seeks to add an additional phrase from the specification that is not definitional for "W" and that EPL is concerned will inject unnecessary confusion into the term.

### 1. Parameters represent, rather than fix, attributes

As discussed in Section B, above, the intrinsic evidence shows that the patentee identified various parameters as representing a particular attribute of the time-scale modification method. The specification never describes those variables as "fixing" that attribute. Indeed, that usage is inconsistent with the express language of the specification as described previously. For the same reasons set forth regarding "Wov," "W" should be defined as representing the particular attribute, not fixing the attribute as Apple asserts.

### 2. The second part of Apple's proposed construction is unnecessary and confusing

Apple adds the phrase "that represents the smallest unit that the time-scale modification method manipulates" to its proposed construction. EPL does not dispute that this phrase appears in the specification. EPL does, however, dispute that it is a necessary part of the definition of "W." The specification describes W as the "window length." For example, the specification states that "window length W is the duration of windowed segments of the input signal – this

19

OPENING CLAIM CONSTRUCTION BRIEF            Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

parameter is the same for input and output buffers and represents the smallest unit of the input signal, for example speech, that is manipulated by the method." '769 Patent, Col. 7:9-13.  The first portion of that statement is definitional – "the duration of windowed segments of the input signal."  The remainder is a further discussion of the method, but not a statement of the definition of "W."

EPL is concerned with Apple's effort to include the additional, non-definitional, language about "W" because it could mislead the trier of fact.  It is undisputed that the value of the parameter "W" can change from one operation of the time-scale modification method to another.  *See* Smith Depo. at 144:3-18 ("Well, W is a parameter that could be changed from one time-scale modification instance to another.").  Apple's proposed definition could lead to unnecessary confusion by suggesting that the value of W should be the smallest unit that the time-scale modification method is **<u>capable</u>** of manipulating.  This would clearly be incorrect.  Dr. Smith admits that W could have different values in different operations of the method.  Thus, while it is true that for a given operation the value of W is the smallest unit that the method will manipulate, Apple's proposed language, standing alone, suggests that it is the smallest unit the method is capable of manipulating.  Apple's additional proposed language creates this unnecessary potential confusion without providing any further definitional clarification.  As shown above, the specification uses only the language offed by EPL as a definition of "W" and does not suggest that the extra phrase added by Apple is necessary to define the term.

**E.    "Ss"**

This is the final parameter claim term that is offered for construction.  The term appears in asserted claims 2 and 11.  The parties' respective proposed constructions are shown below:

| EPL's proposed construction | Apple's proposed construction |
|---|---|
| a parameter that represents the interframe interval between successive analysis windows along the output signal. | a parameter that fixes the interframe interval between successive windows of length W along the output signal. |

OPENING CLAIM CONSTRUCTION BRIEF          Case No. 12-cv-04306 (JST)

1

**1. Apple's addition of "fixes" is improper and unsupported**

2      Apple's proposed wording to add the word "fixes" to its definition is improper for all the

3 reasons discussed previously in Section B regarding the "Wov" term. As set forth below,

4 Apple's proposed language conflicts with the express definition in the patent specification,

5 which matches EPL's definition, not Apple's.

6

**2. EPL's definition is an express definition from the patent specification**

7      Apple does not appear to dispute that where a patentee chooses to act as his or her own

8 lexicographer and to set forth a definition in the patent specification, that definition should

9 govern. Here, EPL's proposed definition conforms to the definition appearing in the patent

10 specification. The specification states "Ss is the synthesis shift and represents the interframe

11 interval between successive windows in the output signal." '769 patent, Col. 12:49-51.

12 Elsewhere, the patent confirms that "synthesis shift Ss is the interframe interval between

13 successive analysis windows along the output signal." '769 patent, Col. 7:16-18. These

14 definitions confirm that Ss represents rather than fixes the interframe interval. This is the

15 primary difference between the parties' proposed constructions. EPL's construction reflects the

16 usage in the specification. Apple's does not, since the specification never states that the

17 parameter "fixes" the interframe interval as Apple proposes.

18      The second difference between the parties relates to whether the windows along the

19 output signal should be referred to as "analysis windows" or "windows of length W" along the

20 output signal. EPL respectfully submits that its proposed construction, unlike Apple's is drawn

21 directly from the language of the specification. It is not clear why Apple chose to depart from

22 the language of the specification for its definition or what further clarity is drawn from Apple's

23 definition. Dr. Smith offers nothing about this aspect of Apple's proposed definition in his

24 declaration.

25

**F. "time scale modification/time scale modifying"**

26      This term appears in claims 1, 10, and 19 of the '769 patent. The parties' respective

27 constructions are set forth below:

28

21

RUSS, AUGUST & KABAT

| EPL's proposed construction | Apple's proposed construction |
|---|---|
| speeding up or slowing down the playback rate | a change to a signal's rate of reproduction without modifying its pitch/changing a signal's rate of reproduction without modifying its pitch |

The primary difference between the parties' proposed definitions is the latter portion of Apple's proposed definition – "without modifying its pitch." The first portions of the parties' definitions seem to be similar, EPL's is simply more readily understood, while Apple's uses slightly more complicated wording. The second portion of Apple's definition, "without modifying its pitch" is not a part of the definition of time scale modification as used in the '769 patent. It is a description of the result of performing a particular method of time scale modification.

### 1. EPL proposes a clear definition from the specification

The specification of the '769 patent describes time-scale modification ("TSM") of a signal as something that can be achieved by either "time-scale compression, i.e., a method for speeding up a playback rate of the signal, or by time-scale expansion, i.e. a method for slowing-down the payback rate of the signal." '769 Patent, Col. 1:27-31. This clear statement from the specification corresponds directly to EPL's proposed definition, and can be readily understood. While the first portion of Apple's proposed construction, "a change to a signal's rate of reproduction" is consistent with this definition, it uses unnecessarily more complex terminology. Apple certainly cannot argue that EPL's proposed definition is inconsistent with usage in the specification, since the specification expressly refers to time-scale modification as speeding up or slowing down the playback rate.

### 2. Apple's added language "without modifying its pitch" is inconsistent with the patent specification

The second portion of Apple's proposed definition stands in direct conflict with the clear and express usage of the term "time-scale modification" in the specification of the '769 patent.

22

OPENING CLAIM CONSTRUCTION BRIEF     Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

The very beginning of the specification refers to the need for "a method which will provide time-scale modification without modifying the pitch or local period of the time-scale modified signals." '769 Patent, Col. 1:17-21.  If the words "time-scale modification" included "without modifying its pitch" as part of their meaning, this passage from the patent specification would make no sense.  Using Apple's proposed definition as a substitute for the words time-scale modification, this specification passage would read: "a method which will provide a change to a signal's rate of reproduction without modifying its pitch without modifying the pitch or local period of the time-scale modified signals."  The redundancy from this passage shows that Apple's definition incorporates an additional concept into the term "time-scale modification" that was not intended by the patentee.

Testimony from Apple's expert, Dr. Smith, confirms that Apple is applying improper extrinsic evidence and methods to reach its definition.  For example, Dr. Smith testified that "It's a term of art that is used in many papers, and so one of ordinary skill in the art would know without even reading the specification or even knowing this patent exists would know that time-scale modification includes rate playback change without changing pitch."  Smith Depo. at 180:9-19.  Obviously, claim construction starts with the intrinsic evidence and usage of a term in the context of the patent at issue.  Apple's analysis apparently begins and ends without consideration of the usage in the intrinsic evidence.  That intrinsic evidence contradicts Apple's proposed definition.

### 3.   Apple's added "without modifying its pitch" definition is inconsistent with the use of the term in the claims

The Federal Circuit holds that "while certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).  Here, Apple's proposed construction inserts an additional element into the term "time-scale modification" that would render the term non-sensical in the context in which it appears in the patent claims.  In claim 1 of the '769 patent, the

OPENING CLAIM CONSTRUCTION BRIEF                    Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

term "time-scale modification appears not only in the claim preamble, but also in the final element. Initially, in the preamble, the term is used to refer only to the adjustment of the playback rate of a signal. The extent to which that adjusted signal does or does not have an altered pitch is a function of following the steps recited in the claim – it is not a function of the term "time-scale modification" itself. Apple's expert, Dr. Smith, admitted that the function of preserving the pitch was achieved by "synchronization in the sense of a synchronized overlap-add." Smith Depo, 182:2-17. The overlap-add aspects of the claim are recited in other elements, such as "overlapping Wov signal representations . . ." found in the body of the claim. This is not a defining feature of time-scale modification, as recited in the preamble.

The final element of claim 1 recites that Wov (discussed earlier) "is determined by W and the time-scale modification." Here, it is clear that the time-scale modification, refers to the adjustment in the playback rate, independent of whether pitch is modified. This portion of the claim makes clear that the number of signal representations to be overlapped will be determined (in part) by how much the rate of playback is being altered. EPL's proposed construction is consistent with this usage of the term in the claims. Apple's is not.

## V. DISPUTED CONSTRUCTIONS – '903 PATENT FAMILY

### A. "Current Time"

This is the only term from the '903 patent family in dispute. It appears in asserted claims 4, 12, and 22 of the '903 patent, claims 4 and 16 of the '050 patent and claims 1, 6, 7 and 11 of the '720 patent. The parties' competing constructions are reproduced below:

| EPL's proposed construction | Apple's proposed construction |
|---|---|
| a current position in the media content that can be expressed either as the time elapsed since the beginning of the media content presentation or as a location in the media content stream that is currently being played | measure of time that is unresolved as to whether the rendering system should return a presentation time parameter value or a data time parameter value |

24

OPENING CLAIM CONSTRUCTION BRIEF          Case No. 12-cv-04306 (JST)

RUSS, AUGUST & KABAT

### 1.   EPL's definition comes directly from the patent specification

The specification of the '903 patent[3] states that "Current time is, in effect, a current 'position' in the media content that is being displayed and rendered." '903 patent, Col. 1:27-29. The specification and claims both confirm that the current time can be understood to reflect a presentation time and a content time. '903 patent, Col. 1:50-2:7. The presentation time is referenced in the patent as "the time elapsed since the beginning of the media content presentation (hereafter called 'Presentation Time')." *Id.* Col. 1:52-55. The content time is identified in the specification as "a location in the media content stream that is currently being played." *Id.* Col. 1:64-66. The patent explains that in normal speed playback, these two possible representations of "current time" are the same. *Id.* Col. 2:8-10. When the playback rate is altered, however, the amount of presentation time is different that the content time because, for example, at 2x (double) speed, two minutes of content time will be presented in one minute of presentation time.

### 2.   Apple's definition is inconsistent with the specification

EPL's proposed definition precisely tracks the express language of the specification of the '903 patent. Apple's proposed definition is nowhere to be found in the patent specification. Apple cannot point to any place where the specification states that "current time" is an "unresolved" measure. To the contrary, the specification states that "current time" can be expressed in two different ways and explains that different components in a rendering system require one or the other measure of current time. *See, e.g.,* '903 patent, Col. 2:20-35. The '903 patent teaches methods of insuring that each component of a system receives the correct form of the "current time" in situations where the distinction between the two expressions of current time is important, such as where the playback speed is altered. Apple's definition inserts unnecessary and unsupported ambiguity into the term and should be rejected.

---

[3] EPL refers in this section to the '903 patent for convenience. The same text referenced here appears in the specifications of the '050 and '720 patents as well.

OPENING CLAIM CONSTRUCTION BRIEF            Case No. 12-cv-04306 (JST)

Dated: November 8, 2013

Respectfully submitted,

RUSS AUGUST & KABAT

By:_____/s Brian D. Ledahl_____
          BRIAN D. LEDAHL

Attorneys for Plaintiff
EPL Holdings, LLC.

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26